### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG

**ALICE L. JONES,**

       **Plaintiff,**

**v.**                                  **CASE NO. 6:11-cv-00721**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

    This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

    Plaintiff, Alice L. Jones (hereinafter referred to as "Claimant"), filed an application for SSI on April 15, 2009, alleging disability as of January 1, 2007, due to cervical spine arthritis, back pain, left shoulder pain, bipolar, tired, mental problems, carpal tunnel syndrome, and high blood pressure. (Tr. at 9, 115-17, 136-44, 170-76, 181-87.)[1] The claim was denied initially and upon reconsideration. (Tr. at 9, 58-62, 66-68.) On March 10,

---

[1] Claimant previously filed applications for SSI on April 28, 2000 and March 14, 2006, alleging disability as of December 31, 1993 and March 14, 2006, respectively. The claims were denied initially and there is no evidence to indicate an appeal was filed on the determinations. (Tr. at 9.)

2010, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 69-70.)  The video hearing was held on May 19, 2011 before the Honorable John W. Rolph.  (Tr. at 24-52, 79-85, 86-91, 107-08, 109-10.)  By decision dated May 27, 2011, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 9-20.)  The ALJ's decision became the final decision of the Commissioner on August 12, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On October 11, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it

2

does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 11.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc disease of the cervical spine, left carpal tunnel syndrome with ulnar neuropathy/paresthesia, chronic pain syndrome, major depressive disorder, anxiety disorder, NOS [not otherwise specified], and borderline personality disorder. (Tr. at 11-12.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 12-14.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 14-19.) As a result, Claimant can return to her past relevant work as a security guard. (Tr. at 19-20.) On this basis, benefits were denied. (Tr. at 20.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was 52 years old at the time of the administrative hearing. (Tr. at 29.) Although records indicate Claimant has a twelfth grade education, Claimant testified that she had a ninth grade education. (Tr. at 31, 39, 142, 250.) She took a six to eight-week medical assistant training course after she left school. (Tr. at 250.) In the past, she worked as a security officer, home health care aide, a pizza delivery employee, a factory laborer, and as a traveling carnival worker. (Tr. at 148, 158, 250.) She testified that she did not work

between 1980 and 1999 "because I was having my [five] children."  (Tr. at 39, 43.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Health Evidence

On May 23, 2009, Claimant was treated at the Emergency Department of Camden-Clark Memorial Hospital for "exacerbation of carpal tunnel left hand."  (Tr. at 231.)  Brian Richardson, M.D. stated:

> At this time, will place patient in velcro splint to minimize the awkward positions and subsequent paresthesias that she has from this.
>
> At this time I do not think she has any evidence of CVA, TIA or other acute neurologic deficits.  This appears to be isolated to the wrist area, shoulders.  The shoulder pain that she describes is reproducible with movement, touch and palpation.  Appears musculoskeletal in nature.
> I will prescribe some Lortab and have her follow-up with Charlotte Lance [sic, Lantz] in Coplin Clinic and return if any concerns arise.

(Tr. at 231-32.)

On June 5, 2009, Claimant was treated by Charlotte Lantz, FNP [Family Nurse Practitioner] at Wirt County Health Services Association, Coplin Clinic, for left hand numbness and left shoulder pain.  (Tr. at 202-03.)

On June 12, 2009, Claimant had a cervical spine x-ray and left shoulder x-ray at Camden-Clark Memorial Hospital.   (Tr. at 209-210.)   Terry C. Shank, Radiologist, concluded:

> CERVICAL SPINE...IMPRESSION:
> 1. The C5 vertebral body is sclerotic, and there is some slight loss of vertebral body height.  Prominent degenerative disc changes are noted at the C5-C6 and C6-C7 levels...

2.  With flexion, there is approximately a 2-3 mm anterior subluxation of C4 on C5 which reduces to 1-2 mm with extension.  There is spurring within the facet joints at the C3-C4 and C4-C5 levels on the left and at the C4-C5 and C5-C6 levels on the right.

LEFT SHOULDER, 3 VIEWS...IMPRESSION:
1.  Unremarkable plain film radiograph evaluation of the left shoulder.

(Tr. at 209-10.)

On July 15, 2009, Claimant was treated at Wirt County Health Services Association, Coplin Clinic: "Results of recent spine x-ray (cervical) explained to patient, she does not want neuro referral or further work up at this time...Patient was provided with exercise plan which should enhance shoulder mobility." (Tr. at 204-05.)

On July 30, 2009, L. Scott Sole, M.D., Parkersburg Neurological Associates, Inc. stated that he had assessed Claimant  and that she had "probable left ulnar neuropathy." (Tr. at 301.)

On August 30, 2009, Claimant was treated at the Emergency Department of Camden-Clark Memorial Hospital for back pain.  (Tr. at 215-24.)  Mark Perni, D.O. stated:

Impression: Chronic Mid Back Pain.  Patient discharged to Home/Self Care in Stable condition with instructions on Back Pain, a prescription for Flexeril 10 mg 30 (thirty) tablets 1 tablet by mouth three times a day as needed, Ultram 50 mg 30 (thirty) tablets 1-2 tablets by mouth every 4-6 hours as needed.

(Tr. at 216.)

On September 29, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment.  (Tr. at 241-48.)  The evaluator, Mary McLarnow, M.D. stated that Claimant's primary diagnosis is "Back Disorder" and her secondary diagnosis is "Radiculopathy." (Tr. at 241.)  Regarding exertional limitations, Dr. McLarnow concluded that Claimant could occasionally lift and/or carry 20 pounds, frequently lift

and/or carry 10 pounds, stand, walk and/or sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and was unlimited in her abilities to push and/or pull.  (Tr. at 242.)  She noted that Claimant could frequently do all postural limitations save for climbing ladder/ rope/scaffolds and crawling, which could be done occasionally.  (Tr. at 243.) Regarding manipulative limitations, she noted that Claimant was limited in "reaching all directions" and "feeling" and unlimited in "handling" and "fingering."  (Tr. at 244.) She further noted: "Reaching bilat [bilaterally] overhead "occas [occasionally]."  Id.  Dr. McLarnow concluded that Claimant had no visual or communicative limitations.  (Tr. at 244-45.)    Regarding environmental limitations, she found Claimant was unlimited regarding exposure to humidity, noise, fumes, odors, dusts, gases, poor ventilation, etc., should avoid concentrated exposure to extreme cold or heat, wetness and vibration, and avoid even moderate exposure to hazards.  (Tr. at 245.)  Dr. McLarnow concluded: "ADLs: cares for her own personal needs, does household chores, cares for her daughter, cooks. She reports problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing due to back pain.  She can walk a short distance before resting for 10 minutes.  Credible."  (Tr. at 248.)

On January 15, 2010, L. Scott Sole, M.D., Parkersburg Neurological Associates, Inc., stated that he had seen Claimant for follow-up: "Her exam remains essentially unchanged, still shows numbness in the fourth and fifth digits.  There is no atrophy.  ASSESSMENT: Paresthesias, history of left carpal tunnel and ulnar neuropathy."  (Tr. at 299.)

On February 19, 2010, A. Rafael Gomez, M.D., completed a "Case Analysis" and concluded: "I have reviewed all of the evidence in file and the PRFC of 09/29/09 is affirmed as written.  Note that the recent information did not provide any new medical findings."

7

(Tr. at 305.)

Mental Health Evidence

Records indicate Claimant was treated at the Worthington Center on July 1, 2009, July 29, 2009, August 31, 2009, October 8, 2009, and December 16, 2009 by Mary Fauteaux, PA-C [Physicians Assistant - Certified] for psychiatric concerns.  (Tr. at 275-84.)

On July 1, 2009, Ms. Fauteaux noted: "Hasn't been here in 8-9 months...has been DX [diagnosed] bipolar, severe manic depressant, suicidal tendencies, and personality d/o [disorder. C/o [complains of] crying a lot, isolating at home, shakey [sic, shaky], trembling inside...possible incest with Dad still touching, talking inappropriately...Suicidal...always thinking about it...Hx [history of] cutting forearms."  (Tr. at 283.)

On July 29, 2009, Ms. Fauteaux noted: "Pt [patient] says she is not good.  She just wants to get away.  Been crying for a couple days.  She is feeling very depressed and feels like she can't deal with her kids...Lexapro 10 mg TQD...Resume Wellbutrin SR 150 mg, Trazadone 50 mg...Referred for counseling."  (Tr. at 281.)

On August 31, 2009, Ms. Fauteaux noted that a friend had accompanied the Claimant to the office visit: "Dealing with a lot of pain and feeling down...Friend says she has 9 distinct personalities with different names."  (Tr. at 279.)

On October 8, 2009, Ms. Fauteaux noted that Claimant was having "arguments with kids, getting to the point where she doesn't want to go home.  Children mouth her off...Lives with male 'friend'...Applying for disability."  (Tr. at 277.)

On November 9, 2009, a State agency medical source provided an adult mental status consultative evaluation report.  (Tr. at 249-56.)  The examiner, Paul A. Dunn, Ph.D., noted:

RECORD REVIEW: Application materials from DDS were received and reviewed. There was also medical evidence in the form of two psychiatric visit notes with a physician assistant, Mary Fauteaux at Worthington Center dated July 1 and July 29, 2009. In these notes she is given a diagnosis of 296.33 and 300.00. She presents as being rather depressed in both of these sessions, and she is restarted on antidepressant medication.

                              *          *          *

MARITAL HISTORY: She has been married three times. Her first husband, Frank, she was married to she guesses from 1973 through 1976. They had no children. She has difficulty coming up with the start of her second marriage, but eventually we figured that it must have been about 1976 and lasted until 1983 again with no children. She was married to her third husband from 1986 to 1999 and again there were no children. She does have five different children with all different fathers. She could not remember the names of the fathers and had difficulty coming up with the ages of her children, but she figured that her sons are 32, 29, 22, and 17 and that she has a daughter who is 13. The two youngest children live with the claimant.

                              *          *          *

MENTAL HEALTH HISTORY: She said she first went for treatment when she was 15 years old at the Hanna Pavilion, and her mother had placed her there and she was an inpatient for two to three weeks. She had great difficulty giving this history. She said when she was in her 30's she cut her wrists and ended up in an inpatient unit in Euclid, Ohio for a week and a half. When she was either 49 or 50 years of age she said she was an outpatient at Recovery Resource in Cleveland for six to seven months, had a case manager and counselor, and a psychiatrist in that treatment sequence. She said she went to Worthington Center in May 2009 and started seeing a Physician Assistant, Mary Fauteaux, once every two months and was to be assigned a therapist.

SUBSTANCE HISTORY: None. She smokes somewhat less than a pack of cigarettes per day.

LEGAL HISTORY: She said she was accused of breaking into a house and holding some family at knife point, but said that she got the charges dropped.

TRAUMA HISTORY/ABUSE: She said that she was beaten up by a boyfriend in 1999 and actually says she sustained a broken neck in that encounter, but she had no medical attention or loss of consciousness at the time.

SUICIDAL OR SELF-INJURIOUS BEHAVIOR/IDEATION: She said that she has made efforts to get attention by cutting her wrists and her arms when she was in her 30's perhaps five or six different times. She had medical attention for only one of these episodes, and at that time she was placed on the inpatient psyche unit, but did not follow up with any therapy after that.

9

MENTAL STATUS EXAMINATION: Behavior: Motor activity, she was mildly restless during the evaluation. She had pained, grimaced expression on her face most of the time in the evaluation. Emotional State: Her affect was mildly depressed. Her mood was depressed. Attitude: She was very reserved in the evaluation. She cooperated to the extent that she needed to. She had a below average level of focused eye contact in the evaluation. Speech: She was clear, coherent, articulate, and of normal tone and rhythm, below average fluency. Orientation: She was oriented to person, date, day of the week, and somewhat to the purpose of the exam, but not to the location of the exam nor the time of day. Thought Process/Content: The claimant's stream of thought was relevant, logical, but very poorly organized. She did not exhibit any evidence of thought disorder though the medical evidence diagnoses her with psychotic delusions or grandiosity or paranoia or persecutory statement or delusions. Perceptual: The claimant did not exhibit any perceptual disturbance in the exam nor did she endorse any history of auditory or visual hallucinations. Concentration: The claimant was within normal limits based on a standard score of 13 on the Digit Span subtest of the WAIS-IV. Immediate Memory: Within normal limits based on the claimant recalling four of four words immediately after they were presented. Recent Memory: Within normal limits based on the claimant recalling three of the four words after a 15-minute delay. Remote Memory: Severely deficient as evidenced by the claimant's inability to recall personal historical data without significant difficulty. Judgment: Moderately deficient, based on the claimant obtaining a scaled score of 5 on the Comprehension subtest of the WAIS-IV. Persistence: Moderately deficient based on the observation of the claimant's pain interfering with her staying on task and making consistent effort during the objective testing. Pace: Mildly deficient based on observation of the claimant's below average pace during the objective testing.

SOCIAL FUNCTIONING: During the Evaluation: Social functioning was mildly deficient. The claimant made intermittent appropriately focused eye contact, engaged in little conversation and displayed appropriate social graces in general, though she was rather reserved. Self-Reported: She said she does not have any friends. She would rather stay away from her family even they keep saying "bad things about me." She does not relate to her own children, but she feels like she is a referee in their fights with each other. She said they only come to her one to one if they need something or she interacts with them in lecturing them. She said, "I get what I need and get out" when I go shopping.

DAILY ACTIVITIES: In a typical day, she lives in a house that she rents with her two children who are 13 and 17. She shops with her daughter-in-law and does not like to go alone, and as mentioned, gets what she needs and leaves. She plays games on her computer on the Internet. She does laundry, vacuums and dusts and does this in a paced manner because of the pain that

she has.

<u>DIAGNOSTIC IMPRESSION</u>:

| Axis I | 296.32 | Major Depressive Disorder, Recurrent, Moderate, |
| | 338.4 | Chronic Pain Syndrome. |
| Axis II | V71.09 | No diagnosis. |
| | | |
| Axis III | | Chronic pain. |
| Axis IV | | Chronic medical problems. |
| Axis V | | Current GAF = 60 moderate symptoms. |

<u>DIAGNOSTIC RATIONALE</u>: The claimant has a diagnosis of bipolar disorder in the medical evidence, but there is not enough evidence presented in this exam to suggest significant mood swings either of a depressive type, mixed type, or manic type.  It would appear that she has been in several depressive episodes, but at this time there is not enough medical evidence to verify that. The evidence is clear that she presents as depressed and has had a history of depression.  The chronic pain syndrome diagnosis is given because of her very strong preoccupation with her chronic pain, which is typical of persons who have been in pain for a period of time.  She has some anxiety and some depression that is a direct result of that situation as well as some frustration and anger.  Though there is a diagnosis of personality disorder in the evidence, there is again insufficient evidence at this time to diagnose her with that through this evaluation.

<u>PROGNOSIS</u>: Poor.

<u>CAPABILITY</u>: The claimant is capable of managing funds, should they be awarded to her.

(Tr. at 250-53.)

On December 14, 2009, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 257-70.)  The examiner, Aroon Suansilppongse, M.D., concluded that an RFC assessment was necessary to access Claimant's affective disorders and that Claimant had a "Co-existing Nonmental Impairment(s) that Requires Referral to Another Medical Specialty."  (Tr. at 257.)  Dr. Suansilppongse found that Claimant had a "mild" degree of limitation regarding restriction of activities of daily living; a "moderate"

degree of limitation regarding difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and "one or two" episodes of decompensation, each of extended duration.  (Tr. at 267.)  He concluded that the evidence does not establish the presence of the "C" criteria.  (Tr. at 268.)

On December 14, 2009, Dr. Suansilppongse completed a Mental Residual Functional Capacity Assessment form.   (Tr. at 271-74.)   He marked that Claimant was "Not Significantly Limited" in the following abilities: The ability to remember locations and work-like procedures; The ability to understand and remember very short and simple instructions; The ability to carry out very short and simple instructions; The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; The ability to sustain an ordinary routine without special supervision; The ability to work in coordination with or proximity to others without being distracted by them; The ability to make simple work-related decisions; The ability to ask simple questions or request assistance; The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; The ability to be aware of normal hazards and take appropriate precautions; and The ability to travel in unfamiliar places or use public transportation.  (Tr. at 271-72.)

Dr. Suansilppongse marked that Claimant was "Moderately Limited" in the following abilities: The ability to understand and remember detailed instructions; The ability to carry out detailed instructions; The ability to maintain attention and concentration for extended periods; The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; The ability to interact appropriately with

the general public; The ability to accept instructions and respond appropriately to criticism from supervisors; The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; The ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. Id.

> Dr. Suansilppongse concluded:
>
> The claimant is able to understand and remember simple instructions. She is able to carry out simple instructions. Her ability for sustained concentration and persistence or for task completion would be minimally limited due to anxiety and depressive reaction as well as alleged pain. Her ability for appropriate interaction with supervisors, coworkers or the public would be minimally limited due to social withdrawal and infrequent episodes of irritability and crying spells. Her adaptability in a routine work setting would be minimally limited due to anxiety or depressive reaction.
>
> The psychiatric impairment severity does not meet or equal any Listing. The claimant has mental capacity for simple work related activity with minimal limitation due to alleged pain. Claimant's allegations are considered partially credible.

(Tr. at 273.)

On December 16, 2009, Ms. Fauteaux, Worthington Center, noted that Claimant stated that she was "'doing fine' - really happy with move [to Parkersburg]...little by little I'm getting there.'" (Tr. at 275.) She noted that there were no changes in Claimant's psychopharmacology. (Tr. at 276.)

On February 11, 2010, Paula J. Bickham, Ph.D., completed a "Case Analysis" and concluded: "The claimant does not allege a new impairment or a change in her condition on the 3441. I have reviewed all of the evidence in the file and the PRTF and MRFC of 12/14/2009 is affirmed as written. (Tr. at 303.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ "failed to consider limitations in social functioning, persistence and reaching." (Pl.'s Br. at 8.) Specifically, Claimant argues:

> Based on a reading of the ALJ's decision in Ms. Jones' claim, the Court would conclude that the Judge adopted all the medical opinions in the file when he determined Ms. Jones' residual functional capacity. "As for the opinion evidence, the undersigned gives great weight to the opinions of the State Agency consultant physicians...Great weight is also given to the opinions, observations, and diagnoses of the claimant's treating and examining physicians and psychologists as they are consistent with the record as a whole." (Tr. 19). Contrary to this assertion, however, the ALJ did not include limitations found by these physicians and did not explain why these limitations were rejected...
>
> Dr. Dunn observed upon examination that Ms. Jones was moderately deficient in persistence as her pain interfered with her ability to remain on task and make consistent effort. (Tr. 252). Dr. Suansilppongse, a State agency psychiatrist, agreed that Ms. Jones suffered from moderate limitations in social functioning and concentration, persistence or pace. (Tr. 267). In particular, Dr. Suansilppongse indicated that Ms. Jones would be moderately limited in attention and concentration, interacting with the general public, coworkers and supervisors and responding appropriately to changes in work setting. (Tr. 271-72).
>
> Despite these noted limitations, the ALJ found that Ms. Jones' only mental limitation was a need for simple, routine and repetitive work tasks involving only simple instructions. (Tr. 18, Finding No. 4). This is not a sufficient assessment of Ms. Jones' mental limitations...
>
> [T]he ALJ's instruction to the vocational expert to consider only that Ms. Jones needed simple work did not adequately inform the vocational expert of all her mental limitations. There was no indication that Ms. Jones had difficulties with social functioning. Furthermore, there was no recognition of Dr. Dunn's opinion that pain would interfere with Ms. Jones' ability to stay on task.
>
> The ALJ also failed to adopt Dr. McLarnow's opinion concerning limitations in reaching and feeling. Dr. McLarnow, a State agency physician, determined that Ms. Jones was limited to no more than occasional bilateral reaching overhead and had limitations of feelings with the upper extremities. (Tr.

14

244).

The ALJ's failure to include Ms. Jones' limitations in bilateral reaching makes his conclusion that she can return to her past relevant work as a security guard unsupported by substantial evidence. According to the Department of Labor's Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, both a Merchant Patroller (DOT 372.667-038), the job identified by the State agency as Ms. Jones' past relevant work, (Tr. 169), and Guard, Security (DOT 372.667-034), require frequent reaching. (SCO, p. 45, attached). Because the vocational expert testified that his testimony was consistent with the Dictionary of Occupational Titles, as required by Social Security Ruling 00-4p, he could not have testified that Ms. Jones could do her past work as a security guard if the limitation in bilateral reaching had been included.

The ALJ's residual functional capacity finding is not supported by substantial evidence because he did not explain why he did not adopt the limitations noted by Drs. Dunn and Suansilppongse concerning Ms. Jones' limitations in persistence and social functioning nor the limitations in bilateral reaching and feeling noted by Dr. McLarnow. Because the residual functional capacity was not supported by substantial evidence, the Judge's conclusion that Ms. Jones had sufficient capacity to perform her past relevant work as a security guard is not supported by substantial evidence. Social Security Ruling 82-62. The Commissioner's decision should be reversed and this matter remanded for proper findings of fact concerning the claimant's residual functional capacity and her ability to perform her past relevant work.

(Pl.'s Br. at 9-12.)

<u>The Commissioner's Response</u>

The Commissioner asserts that the ALJ's decision is supported by substantial evidence because the ALJ "reasonably accounted for the limitations arising from Plaintiff's impairments when finding her not disabled." (Def.'s Br. at 13.) Specifically, the Commissioner argues:

Plaintiff asserts that by giving great weight to the opinions of the state agency medical consultants and Plaintiff's treating and examining physicians, the Court should conclude that the ALJ "adopted all of the medical opinions in the file when he determined [Plaintiff's] residual functional capacity" (Pl.'s Br. at 9). This assertion misinterprets the ALJ's decision. While the ALJ stated that he gave great weight to these opinions, he did not state that he

fully adopted these opinions (Tr. 19) as Plaintiff has assumed  (Pl.'s Br. at 9). Because the ALJ did not fully adopt each and every medical opinion, he was not required to account for such opinions when determining Plaintiff's residual functional capacity...just because the ALJ gave great weight to the opinions...does not mean that he was automatically required to adopt every functional limitations identified by these sources.

Plaintiff also faults the ALJ for not accounting for certain findings made by Drs. Dunn, Suansilppongse, and McLarnow when determining Plaintiff's residual functional capacity (Pl.'s Br. at 10-13).  For the reasons discussed below, Plaintiff's argument is without merit.

Plaintiff alleges that the ALJ erred because he did not account for Dr. Dunn's opinion that Plaintiff had moderately deficient persistence based on Plaintiff's alleged "pain interfering with her staying on task and making consistent effort during the objective testing"  (Pl.'s Br. at 10).  In other words, Dr. Dunn based this moderate limitation on Plaintiff's allegations of pain during the examination.  However, Plaintiff's allegations of pain are not credible, and, therefore, any limitations based upon those allegations were not entitled to significant weight.  The ALJ specifically determined that Plaintiff's complaints of pain were not fully credible based on Plaintiff's lack of significant or consistent medical treatment for her physical conditions, the fact that she did not take pain medication for her conditions, and her statement that her pain was at it's worst only moderate (Tr. 16-19)...

Plaintiff also states that the ALJ erred by not accounting for Dr. Suansilppongse's opinion in his December 2009 mental residual functional capacity [MRFC] form that Plaintiff was moderately limited in her abilities to maintain attention and concentration; interact with the general public, coworkers, and supervisors; and respond appropriately to changes in the work setting (Pl.'s Br. at 10).  Plaintiff's argument is not persuasive.

Although Dr. Suansilppongse checked the box "moderately limited" regarding Plaintiff's abilities to maintain attention and concentration and to respond appropriately to changes in the work setting in Section I of the MRFC assessment form, the Agency's Program Operations Manual System (POMS), section DI 24510.060, explains that this section of the form is "merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and **does not constitute the RFC assessment**" (emphasis in original).  In contrast, Section III of the form is the place where the medical consultant records what a claimant can still do despite her impairments.

In Section III of the form, Dr. Suansilppongse clarified that Plaintiff's abilities to maintain concentration and task persistence and her adaptability in a

routine work setting would only be *minimally* limited (Tr. 273).  Because any limitation Plaintiff had in these two areas was only minimal, a limitation to simple, routine, repetitive work tasks involving simple instructions would reasonably account for such limitations.

Regarding Plaintiff's ability to have appropriate interactions with supervisors, coworkers, or the public, Dr. Suansilppongse also clarified that such limitation would only be minimal (Tr. 273).  Minimal limitation in this area would not prevent Plaintiff from performing her past work as a security officer as she had performed that work.  According to Plaintiff, this job required her to check identification badges and brief cases of individuals entering a building and walking around the perimeter of the building from 45-minutes to one hour at a time (Tr. 38).  While Plaintiff worked with another officer, she did not work with a supervisor (Tr. 38-39).  In addition, Plaintiff's most recent mental assessment, made two days after Dr. Suansilppongse completed his assessment form, shows that Plaintiff's symptoms were transient and expectable and any functional limitations she had were no more than slight and temporary.  Thus, because Plaintiff's social limitations, if present, were transient and slight, they would not prevent her from performing her past work that involved only superficial interaction with the public, no direct supervision, and long periods of independent patrol activities.

Finally, Plaintiff asserts that the ALJ erred because he did not "adopt" Dr. McLarnow's opinion that Plaintiff had a limited ability to feel and could only occasionally perform overhead reaching because of cervical spine degenerative disc disease (Pl.'s Br. at 11-12).  This argument is without merit.  Regarding the limitation on Plaintiff's ability to feel, as explained by the ALJ, Dr. Sole's July 2009 examination of Plaintiff revealed only  mild left hand symptoms (Tr. 18).   Specifically, the only abnormality uncovered was Plaintiff's decreased sensory perception to light touch in the ulnar aspect of her palm and ½ of her ring finger and small finger on her left hand (Tr. 300-01).   This slight decrease in sensation did not prevent Plaintiff from performing daily activities such as driving, shopping, and playing with her computer (Tr. 18, 36).

Furthermore, Plaintiff's excuse for not using a hand splint recommended by Dr. Sole completely undermines her claim she required work-related accommodation due to her minimal left hand numbness...because she was "taking care of her young children and if she wears the splint she is unable to get what they need fast enough" (Tr. 299).  However, this claim appears false because, at the time Plaintiff gave this excuse, her youngest child was approximately fourteen years old (Tr. 43).  For these reasons, the ALJ reasonably found that Plaintiff did not experience functional limitation resulting from carpal tunnel syndrome (Tr. 18).

Regarding Dr. McLarnow's finding that Plaintiff could only perform occasional overhead reaching, the ALJ reasonably did not "adopt" this limitation.  As explained by the ALJ, Plaintiff's level of daily activities, coupled with the fact that she did not even seek treatment for her spinal impairment until twenty months after her alleged onset date, undermine her complaints related to her cervical spine impairment (Tr. 18)…Additionally, Plaintiff's complaints of limitations resulting from her spinal impairment are undermined by the fact that she declined to take anti-inflammatory medication prescribed for her alleged spine pain (Tr. 42), declined a referral to a neurologist for further examination (Tr. 204), and did not require prescription pain medication (Tr. 276, 300). Further, when Plaintiff did seek treatment for her spine condition, she had normal muscle strength, normal muscle tone, and normal deep tendon reflexes in her upper extremities (Tr. 218). Therefore, in light of Plaintiff's lack of medical treatment, lack of need for medication, and her normal physical examination findings, the ALJ reasonably did not adopt Dr. McLarnow's findings that Plaintiff could only occasionally perform overhead reaching.  Therefore, substantial evidence supports the ALJ's decision that Plaintiff was not disabled.

(Def.'s Br. at 14-19.)

Claimant's Reply

Claimant replied to the Commissioner's brief:

The Court should ignore Defendant's Brief in this matter.  The Court may not affirm the ALJ's decision based on justifications proffered by the Defendant's attorney because the Judge did not base his decision on these reasons.  The Court may only affirm the ALJ's decision based on reasons stated in his decision…Furthermore, the post hoc justifications proffered by Defendant's attorney are inconsistent with the ALJ's findings.

(Pl.'s Reply Br. at 1.)

Regarding the Commissioner's argument regarding Dr. Suansilppongse's opinion,

Claimant asserts:

There is nothing to support this contention in his decision…A conclusion that Ms. Jones was only limited in social functioning is inconsistent with the Judge's conclusion that she was moderately limited in social functioning (Tr. 13) and that her major depressive disorder, anxiety disorder and borderline personality disorder were severe impairments that caused significant limitation of function.  (Tr. 11).

(Pl.'s Reply Br. at 1-2.)

Regarding the Commissioner's argument regarding Dr. Dunn's opinion, Claimant

asserts:

> Defendant also argues that the ALJ did not credit Dr. Paul Dunn's
> observation that claimant's pain interfered with her ability to stay on task and
> make consistent effort because the Judge found that Ms. Jones' testimony
> concerning her pain was not credible. (Def.'s Br. at 15). The ALJ did not
> discredit Dr. Dunn's observation on that basis. In fact, the Judge did not
> mention this observation by Dr. Dunn at all. Instead, he stated that great
> weight was given to Dr. Dunn's report. (Tr. 19).

(Pl.'s Reply Br. at 2.)

Regarding the Commissioner's argument regarding Dr. McLarnow's opinion,

Claimant asserts:

> Defendant's attorney lastly argues that the ALJ did not credit Dr. McLarnow's
> opinion that Ms. Jones was limited in reaching in all directions and feeling
> based on a number of factors including the age of Ms. Jones' youngest child.
> Again, the ALJ did not discredit Dr. McLarnow's opinion concerning reaching
> and feeling based on these factors. The only discussion of Dr. McLarnow's
> opinion was that it was entitled to great weight. (Tr. 19).

Id.

Claimant concluded:

> Because the ALJ stated only that every medical opinion in the record was
> entitled to great weight, even those that conflict with his findings, the Court
> has no way to know what weight he actually gave to each opinion. This is why
> the Fourth Circuit held that the ALJ must *explicitly* indicate the weight he
> gave to all the medical evidence for the court to determine whether his
> findings are supported by substantial evidence. *Gordon v. Schweiker*, 725
> F.2d 231, 235 (4th Cir. 1984); *Hammond v. Heckler*, 765 F.2d 424, 426 (4th
> Cir. 1985)...

> Ms. Jones does not argue that the ALJ was required to adopt each of the
> limitations noted by Drs. Dunn, Suansilppongse and McLarnow. Instead,
> Fourth Circuit precedent and the Commissioner's own policy require the ALJ
> to explain why a particular opinion was not adopted. **Social Security
> Ruling 96-8p** provides that the adjudicator must explain why an opinion is

not adopted if the residual functional capacity assessment conflicts with an opinion from a medical source.  Furthermore, the Commissioner's policy in **Social Security Ruling 96-5p** reminds adjudicators, "...that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one."

Because the ALJ did not explain why he did not adopt these particular opinions, the Court cannot determine whether the ALJ's decision is supported by substantial evidence.  The Commissioner's decision should be vacated and this matter remanded for proper findings of fact concerning Ms. Jones' residual functional capacity.

(Pl.'s Br. at 3-4.)

<u>Analysis</u>

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. § 416.945(a) (2011).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  <u>Id.</u>  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. § 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Social Security Ruling [SSR] 96-8p describes how the ALJ is to assess residual functional capacity [RFC] in initial claims. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted. Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record, the adjudicator must give it controlling weight.

In the subject claim, the ALJ made these findings regarding the opinion evidence:

> As for the opinion evidence, the undersigned gives great weight to the opinions of the State Agency consultant physicians, as these expert opinions are balanced, objective, and consistent with the evidence of record as a whole (Exhibits 4F, 6F, 7F, 9F, 11F, and 12F). Although these experts did not have an opportunity to examine or treat the claimant, the reports clearly reflect a thorough review of the record and are supportable. In short, these experts' familiarity with Social Security Administration disability evaluation program and the evidence of record warrants the greatest weight. That said giving the claimant the benefit of the doubt, the residual functional capacity reflects additional limitations not considered in these assessments. Great weight is also given to the opinions, observations, and diagnoses of the claimant's treating and examining physicians and psychologists as they are consistent

21

with the record as a whole.

Accordingly, based upon the substantial weight of the objective medical evidence, the claimant's course of treatment, her level of daily activity, and work history, the undersigned finds that the claimant retains the residual functional capacity for the range of light work identified above.

(Tr. at 19.)

In the subject claim, the ALJ has not considered and addressed the medical source opinions per the Social Security rules and regulations for the RFC assessment. SSR 96-8p requires that if the ALJ's RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

As alleged by Claimant, the ALJ did not include limitations found by Drs. Dunn, Suansilppongse, and McLarnow and did not explain why these limitations were rejected. In fact, of the three examiners in question, only Dr. Dunn is even mentioned by the ALJ in his decision. (Tr. at 9-20.)  The ALJ made these findings regarding Dr. Dunn's report:

In December 2009, Paul Dunn, Ph.D., noted that although there was a diagnosis of bipolar disorder in the medical evidence, there was not enough evidence presented to suggest significant mood swings of any type.  He noted the claimant had several depressive episodes but there was not enough evidence to verify.  Dr. Dunn diagnosed chronic pain syndrome because of the claimant's very strong preoccupation with her chronic pain and noted anxiety and depression was a direct result of that situation.  He further noted that although the evidence revealed a diagnosis of personality disorder, he saw no evidence to diagnose it.  On evaluation, remote memory was severely deficient as evidenced by an inability to recall personal data.  Judgment and persistence were moderately deficient and pace and social functioning were mildly deficient.  She presented as mildly restless and mildly depressed.  However, immediate and recent memory and concentration were within normal limits.  She was oriented to person, date, and day of the week and was reserved but cooperated as needed (Exhibit 5F).

(Tr. at 17-18.)

As noted by Claimant, Dr. Dunn found that Claimant was moderately deficient in

22

persistence as her pain interfered with her ability to remain on task and make consistent effort (Tr. 252).  Dr. Suansilppongse agreed that Claimant suffered from moderate limitations in social functioning and concentration, persistence or pace (Tr. 267).  He indicated that Claimant would be moderately limited in attention and concentration, interacting with the general public, coworkers and supervisors and responding appropriately to changes in work setting  (Tr. 271-72).  Yet, the ALJ found that Claimant's only mental limitation was a need for simple, routine and repetitive work tasks involving only simple instructions.  (Tr. 18, Finding No. 4).  As concluded by Claimant, "This is not a sufficient assessment of Ms. Jones' mental limitations." (Pl.'s Br. at 10-11.)

The undersigned proposes that the presiding District Judge find that it was not sufficient for the ALJ to simply state "the undersigned gives great weight to the opinions of the State Agency consultant physicians" and not state the name of the physician and provide detailed information regarding the physician's findings.  (Tr. at 19.) Social Security Ruling 96-8p states that the adjudicator must explain why an opinion is not adopted if the residual functional capacity assessment conflicts with an opinion from a medical source.

Claimant goes on to assert that the ALJ failed to give adequate information to the vocational expert regarding Claimant's limitations:

> [T]he ALJ's instruction to the vocational expert to consider only that Ms. Jones needed simple work did not adequately inform the vocational expert of all her mental limitations.  There was no indication that Ms. Jones had difficulties with social functioning.  Furthermore, there was no recognition of Dr. Dunn's opinion that pain would interfere with Ms. Jones' ability to stay on task.

(Pl.'s Br. at 11.)

The ALJ's instructions to the vocational expert at the hearing were as follows:

Q        Okay. I would like to bring a hypothetical scenario for you at this time and then following up with some additional questions. Initially, I would like you to assume a hypothetical individual who is able to lift up to 20 pounds occasionally, lift and carry up to ten pounds frequently in light work as defined by the regulations. This person may frequently climb ramps and stairs, bend, balance, stoop, kneel, and crouch and may occasionally climb ladders, ropes, and scaffolds and crawl. This person must avoid concentrated exposure to extreme cold, heat, wetness, vibration, and irritants such as fumes, odors, dust, gases, chemicals and poorly ventilated spaces. This person must avoid even moderate exposure to hazards, such as moving machinery and heights. This individual is fully capable of learning, remembering, and performing simple routine and repetitive work tasks involving simple work constructions. If we take into consideration a hypothetical individual with those limitations, could such an individual so limited perform the past relevant work or performed either as she performed or as it is generally performed in the national economy?

A        Yes.

Q        And, which one?

A        Certainly, the security officer...She also did some pizza delivery. She certainly could do that and she was a material handler for a while and I feel she can do that...

Q        Okay. All right and I would like to add to that a hypothetical of following additional limitations. I would like you to assume that our hypothetical individual must be allowed to sit or stand at will, provided she is not off-task more than 10 percent of the work period. If we add that limitation to hypothetical number one, could a person with those limitations perform the past relevant work of our claimant?

A        Yes.

Q        To both of those hypotheticals, sir, I would like you to add the following. I would like you to assume that due to a combination of severe physical and/or mental impairments and associated pain and other symptoms, this individual is unable to maintain sufficient concentration, persistence, or pace to perform even simple and routine tasks on a regular and continuing basis, eight hours a day, five days a week, or a 40-hour work week, or equivalent work schedule and if that were the case, would our claimant be able to perform her past relevant work with those limitations?

24

A        No, sir.

Q        Would there be any jobs she could perform?

A        No, sir.  There would be zero jobs.

Q        And, is your testimony today consistent with the dictionary of occupational titles?

A        Yes.

(Tr. at 48-51.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989).  "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity."  Id. at 51.  Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In the subject claim, the ALJ found Claimant to have the following severe impairments: "degenerative disc disease of the cervical spine; left carpal tunnel syndrome with ulnar neuropathy/paresthesia; chronic pain syndrome; major depressive disorder; anxiety disorder, NOS; and borderline personality disorder."  (Tr. at 11.)  As noted above,

the ALJ did not include severe mental impairments or pain in his hypotheticals to the vocational expert until the final hypothetical wherein the vocational expert responded that Claimant would be unable to perform any jobs. (Tr. at 50-51.) The undersigned proposes that the presiding District Judge find that the hypotheticals posed by the ALJ to the vocational expert were inadequate as they failed to take into consideration Claimant's difficulties with social functioning and how pain would interfere with Claimant's ability to stay on task.

Finally, the undersigned notes that the ALJ also failed to discuss the opinion of Dr. McLarnow concerning Claimant's limitations in reaching and feeling. Dr. McLarnow determined that Ms. Jones was limited to no more than occasional bilateral reaching overhead and had limitations of feelings with the upper extremities. (Tr. 244.) Claimant argues:

> The ALJ's failure to include Ms. Jones' limitations in bilateral reaching makes his conclusion that she can return to her past relevant work as a security guard unsupported by substantial evidence. According to the Department of Labor's Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, both a Merchant Patroller (DOT 372.667-038), the job identified by the State agency as Ms. Jones' past relevant work, (Tr. 169), and Guard, Security (DOT 372.667-034), require frequent reaching. (SCO, p. 45, attached). Because the vocational expert testified that his testimony was consistent with the Dictionary of Occupational Titles, as required by Social Security Ruling 00-4p, he could not have testified that Ms. Jones could do her past work as a security guard if the limitation in bilateral reaching had been included.

(Pl.'s Br. at 12.)

The undersigned proposes that the presiding District Judge find that the ALJ's residual functional capacity finding is not supported by substantial evidence because he did not explain why he did not adopt the limitations noted by Dr. McLarnow in bilateral

reaching and feeling.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).  Again, it was not sufficient for the ALJ to simply state "the undersigned gives great weight to the opinions of the State Agency consultant physicians" and not state the name of the physician and provide detailed information regarding the physician's findings.  (Tr. at 19.)

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **REVERSE** the final decision of the Commissioner, and **REMAND** this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S.

27

140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

 November 27, 2012
Date

Mary E. Stanley
Mary E. Stanley
United States Magistrate Judge